IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LISA A. CERVENY,

                    Plaintiff,

          vs.

ANDREW M. SAUL, Commissioner of
Social Security,

                    Defendant.

**8:19CV541**

**MEMORANDUM
AND ORDER**

Plaintiff Lisa A. Cerveny brings this action under Title II of the Social Security Act, which provides for judicial review of "final decisions" of the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g) (Westlaw 2020).

## I.  NATURE OF ACTION & PRIOR PROCEEDINGS

### A.  Procedural Background

Cerveny filed an application for Title II disability benefits on January 29, 2017, alleging disability beginning on January 11, 2017. (Tr. 8.[1]) The claims were denied initially and on reconsideration. Following a March 19, 2019, hearing (Tr. 34-73), an administrative law judge ("ALJ") found on April 3, 2019, that Dunn was not disabled as defined in the Social Security Act. (Tr. 23.) On October 17, 2019, the Appeals Council of the Social Security Administration denied Cerveny's request for review. (Tr. 1.) Thus, the decision of the ALJ stands as the final decision of the

---

[1]Citations to "Tr." refer to the administrative transcript, which can be found at Filings 6 and 7.

Commissioner. *Sims v. Apfel*, 530 U.S. 103, 107 (2000) ("if . . . the Council denies the request for review, the ALJ's opinion becomes the final decision").

## B.  Facts

The court adopts Cerveny's Statement of Facts (Filing 12 at CM/ECF pp. 5-17) to the extent they are admitted by the Commissioner. (Filing 16 at CM/ECF pp. 2-3.) The court also adopts the Commissioner's Supplemental Facts. (Filing 16 at CM/ECF pp. 3-9.) Together, these statements provide a fair and accurate description of the relevant record before the court. Additional specific facts will be discussed as necessary to address the parties' arguments.

## C.  ALJ's Determination

Following the five-step sequential analysis[2] for determining whether an individual is "disabled" under the Social Security Act, 20 C.F.R. § 404.1520, the ALJ concluded in relevant part:

(1)    Cerveny has not engaged in substantial gainful activity since January 11, 2017, the alleged onset date. (Tr. 10.)

(2)    Cerveny—who was 51 years old on the alleged disability onset date—has the following severe impairments: degenerative disc disease of her cervical spine, fibromyalgia, osteoarthritis in her right thumb, and bipolar disorder. (Tr. 10

---

[2]*See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (internal quotation marks and citation omitted)).

& 21.)

(3)     Cerveny has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) with additional limitations:

> [T]he claimant is capable of climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, and reaching overhead occasionally. She is able to handle frequently with her right hand. The claimant is capable of work that does not require more than moderate exposure to cold, heat, vibrations, and hazards. She is able to interact occasionally with co-workers, supervisors, and the public. The claimant is capable of performing simple, routine work.

(Tr. 16.)

(4)     Cerveny cannot perform her past relevant sedentary work as a collection clerk, accounting clerk, or receptionist, nor can she perform her past relevant light work as a sales clerk and administrative clerk because the requirements of these positions "exceed[] her residual functional capacity for simple work that does not involve more than occasional social interactions with co-workers, supervisors, or the public." (Tr. 21.) However, there are jobs in the light, unskilled category that exist in significant numbers in the national economy that Cerveny can perform, including a routing clerk, office helper, housekeeping cleaner, and dealer accounts investigator. (Tr. 22.)

(5)     Cerveny was not under a disability within the meaning of the Social Security Act from January 11, 2017, through the date of the ALJ's decision. (Tr. 23.)

## II.  ISSUES ON APPEAL

Cerveny asserts that the ALJ erred in:

(1) failing to recognize and obtain an explanation for the inconsistencies

3

between the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations ("SCO") and the RFC limitations of "reaching overhead occasionally" and the ability "to interact occasionally with co-workers, supervisors, and the public";

(2) relying on the vocational expert's ("VE's") testimony regarding the number of jobs existing in the national economy when the VE used the "equal distribution method" to approximate those numbers;

(3) assigning little weight to the opinions of Cerveny's treating rheumatologist;

(4) failing to include in Cerveny's RFC limitations suggested by psychologists whose opinions were assigned considerable weight by the ALJ; and

(5) issuing a decision in Cerveny's case when the ALJ was an inferior officer not appointed in a constitutional manner.

## III.  STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as

4

adequate to support a conclusion."

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should "'defer heavily to the findings and conclusions of the Social Security Administration.'" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010)).

## IV.  DISCUSSION

## A.  Conflict Between DOT/SCO & RFC Limitations of Occasional Reaching Overhead and Interacting With People

### 1.  Overhead Reaching

Cerveny's RFC states that she "is capable of . . . reaching overhead occasionally." (Tr. 16 (RFC); Tr. 18 ("As a whole, this evidence reasonably supports a finding that the claimant's cervical degenerative disc disease limits her to . . . no more than occasional overhead reaching.").) Yet, Cerveny points out, three of the four jobs the ALJ relied on to deny benefits at step five of the sequential evaluation process required frequent reaching under the DOT—housekeeping cleaner, DICOT 323.687-014 (G.P.O.), *available at* 1991 WL 672783 (2020); office helper, DICOT 239.567-010 (G.P.O.), *available at* 1991 WL 672232; and routing clerk, DICOT 222.687-022 (G.P.O.), *available at* 1991 WL 672133. (Tr. 22.) Despite this possible conflict in reaching requirements, when asked whether there was "any discrepancy between [the VE's] testimony and the Dictionary of Occupational Titles in terms of the jobs, exertion, or skill levels," the VE replied, "No, your honor." (Tr. 70.)

Cerveny argues that the ALJ erred under SSR 00-4p by limiting her to occasional overhead reaching in her RFC, yet relying on VE testimony that identified jobs that required frequent reaching without resolving the apparent conflict. SSR 00-4p provides in part:

> When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

> . . . .

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

*Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist* Evidence*, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000), *available at* 2000 WL 1898704 (Westlaw 2020).

The Commissioner responds that no conflict actually exists between the VE's testimony identifying three DOT jobs that Cerveny could perform and the RFC

because "the DOT only offers a generic job description and provides approximate maximum requirements for each job, [and] it is within the expertise of the VE to interpret the DOT definitions and apply them to Plaintiff's RFC." (Filing 16 at CM/ECF p. 11.) The court can assume that the VE engaged in this interpretive process, says the Commissioner, because the ALJ specifically directed the VE to "avoid jobs where she's required to constantly or frequently reach overhead." (Tr. 61.) The Commissioner also points out that while the three jobs at issue require undefined frequent "reaching" from 1/3 to 2/3 of the time, "none of these jobs could reasonably be seen as requiring frequent *overhead* reaching to the exclusion of *all other types* of reaching." (Filing 16 at  CM/ECF p. 12 (emphasis added).)

"[T]he ALJ has an affirmative responsibility to ask about 'any possible conflict' between VE evidence and the DOT, and its companion publication (the SCO), on the requirements of a job or occupation before relying on VE evidence to support a determination of not disabled." *Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014) (footnote omitted). In *Kemp*, the ALJ gave the VE a hypothetical describing a claimant who could reach overhead only occasionally, but the VE identified a job that involved constant reaching as a job that existed in the economy that the claimant was capable of performing. Because the VE did not explain the possible conflict and the ALJ did not seek an explanation, the Eighth Circuit Court of Appeals vacated the district court's judgment and remanded for further proceedings. *Id*.

Similarly, in *Moore v. Colvin*, 769 F.3d 987 (8th Cir. 2014), the court remanded, holding that the ALJ failed to resolve an apparent conflict between the claimant's physical limitations as described in the ALJ's hypothetical and the requirements of the DOT jobs the VE identified. The ALJ in *Moore* determined that the claimant could only "occasionally perform overhead reaching bilaterally," yet the VE identified two jobs that required frequent reaching (in no specific direction), as in Cerveny's case. Also similar to Cerveny's case, the VE answered affirmatively when the ALJ asked whether the VE's testimony was consistent with the DOT. *Id*. at 989. The court found that the ALJ was not absolved of his duty to "elicit a

reasonable explanation for the conflict" just because the VE responded "yes" when asked whether her testimony was consistent with the DOT. *Id.* at 990. The court concluded that in the absence of discussion during the hearing regarding inconsistencies between a VE's testimony and the DOT, "which the ALJ may accept as reasonable after evaluation," the VE's testimony "'does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform.'" *Id.* (quoting *Kemp*, 743 F.3d at 632).

Because the ALJ did not seek an explanation from the VE regarding the possible conflict[3] between Cerveny's RFC limitation of "reaching overhead occasionally" and the DOT requirements of frequent reaching for the housekeeping cleaner, office helper, and routing clerk jobs, the VE's testimony regarding those jobs cannot "'constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy [Cerveny] can perform.'" *Moore*, 769 F.3d at 990 (quoting *Kemp*, 743 F.3d at 632). Therefore, this matter must be returned to the Commissioner so the ALJ can elicit a reasonable explanation for the possible conflict between Cerveny's RFC limitation of occasional overhead reaching and the DOT requirement of frequent reaching for the housekeeping cleaner, office helper, and routing clerk jobs; to evaluate the reasonableness of any such explanation; and to explain how the ALJ resolved the conflict.[4]

---

[3] Whether or not there was an *actual* conflict—a distinction the Commissioner makes—is really not the issue because SSR 00-4p requires the ALJ to elicit an explanation for "*apparent* unresolved conflicts" (emphasis added).

[4] The Commissioner admits that the fourth and final job identified by the VE and accepted by the ALJ—data accounts investigator—should not have been identified as one Cerveny could perform (Filing 16 at CM/ECF p. 11 n.1). Thus, the ALJ's error as to the other three jobs leaves no jobs that exist in significant numbers in the national economy that Cerveny can perform such that the ALJ's error cannot be considered harmless.

### 2.  Interaction With People

Cerveny next argues that the ALJ erred in relying on the data-accounts-investigator job to deny benefits at step five because that job required frequent talking and hearing, but Cerveny's RFC limited her to occasional interaction with coworkers, supervisors, and the public. Because the Commissioner admits that this job should not have been identified as one Cerveny could perform (Filing 16 at CM/ECF p. 11 n.1), Cerveny's argument with regard to this job is moot, and the court need not address it further.

### B.  Method of Calculating Number of Jobs in National Economy

When testifying about jobs in the national economy that Cerveny could perform, the VE stated that there are 33,000 jobs as a routing clerk, 10,000 jobs as an officer helper, 102,000 housekeeper/cleaner jobs, and 53,000 jobs as a data-accounts investigator. (Tr. 64-70.) Cerveny argues that substantial evidence did not support the ALJ's step-five finding that jobs exist in significant numbers in the national economy that Cerveny could perform because the ALJ adopted testimony from the VE that used the "equal distribution method"[5] to estimate the number of available data-accounts-investigator jobs. However, because the Commissioner concedes that the accounts-investigator job should not have been included in the list of occupations Cerveny could perform (Filing 16 at CM/ECF p. 11 n.1), this court

_____

[5] Cerveny argues that the VE's use of this method is apparent because the VE relied on figures provided by the Bureau of Labor Statistics to testify that there were 161,000 jobs in the "group" to which the data-accounts-investigator job belonged; there were three occupational titles in that group; and, therefore, there were 53,000 data-accounts-investigator jobs available (roughly one-third of 161,000). (Tr. 70-71.) Cerveny's counsel asserts that the VE's assumption that the availability of three occupational titles contained in a group of 161,000 jobs can be calculated simply by dividing 161,000 by three is "inherently flawed and irredeemable especially given there are tools that do attempt to more precisely identify job numbers." (Filing 12 at CM/ECF pp. 26-27.)

need not address Cerveny's "equal distribution method" argument.[6]

Counsel also complains that he "generally is wary of the very rounded job numbers present in this case (33,000, 10,000, 102,000, and 53,000) as they seem a likely tell [sic] the vocational expert was not trying to identify job numbers with any reasonable amount of precision." (Filing 12 at CM/ECF pp. 24-25 n.4.) Counsel submits that "[w]hile job numbers estimates are always going to involve some guesswork given the Department of Labor does not calculate numbers for each DOT job title, there are approaches and software that attempt[] to estimate these numbers with some reasonable precision. *See* Peer Review, SSA Validation Study of TSA Process, https://skilltran.com/index.php/support-area/documentation/219-peer-review (last accessed March 30, 2020)." (Filing 12 at CM/ECF p. 24 n.4.)

Counsel identifies no authority stating that a VE's job-number estimates

---

[6] Plaintiff's counsel correctly points out that the Seventh Circuit Court of Appeals has criticized the "equal distribution method" technique. *See Chavez v. Berryhill*, 895 F.3d 962, 966 (7th Cir. 2018) ("the equal distribution method. . . . operates on the illogical assumption that all job titles within a particular DOT job group exist in equal numbers in the national economy"); *Alaura v. Colvin*, 797 F.3d 503, 507-08 (7th Cir. 2015) ("Typically, it appears, the vocational expert simply divides the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the number of narrow categories in the broad category, thus assuming that each narrow category has the same number of jobs as each other narrow category—which is preposterous." (internal citation omitted)); *Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014) ("if the broad category contains 10,000 jobs, and there are 20 finer categories within it, one of which consists of the jobs the applicant can perform, the vocational expert would estimate, and the administrative law judge accept, that there were 500 jobs in that category. That would be an arbitrary estimate, since there would be no basis for thinking that all the finer categories include the same number of jobs . . . ."). However, Plaintiff's counsel points to no Eighth Circuit authority adopting this criticism, nor has the court found any.

cannot be considered substantial evidence of jobs existing in significant numbers in the national economy when those estimates contain round numbers or when the VE does not use the estimation software plaintiff's counsel prefers. Nor has the court located such authority. *See, e.g.*, *Forsythe v. Colvin*, 813 F.3d 677, 680 (7th Cir. 2016) (noting in discussion of issues not raised by plaintiff's lawyer but deserving mention (according to the court), the ALJ's and VE's failure to find out or explain how VE obtained "suspiciously round numbers of 1000, 1000, and 2000 of each type of job," numbers that "sound[ed] like guesses"; stating that VEs and ALJs "can't be blamed for the poverty of the data concerning jobs that applicants for social security disability benefits are capable of performing" because "[i]t is high time that the Social Security Administration turned its attention to obtaining the needed data").

Further, counsel did not cross-examine the VE during the administrative hearing or submit argument in post-hearing briefing questioning the reliability of the VE's job-number estimates or the VE's sources, methodology, or qualifications[7]; there is no evidence (or argument) that the VE's testimony was inconsistent with the information contained in the Dictionary of Occupational Titles such that the ALJ had a duty to inquire into the basis for the VE's testimony; and Cerveny's counsel admitted during the administrative hearing that the VE "competently [was] able to provide two jobs [that Cerveny could perform]." (Tr. 70, 72, 331-32.) *See Courtney v. Commissioner*, 894 F.3d 1000, 1003 (8th Cir. 2018) (ALJ has no duty to inquire into the basis for VE's testimony before relying on it when testimony does not conflict with DOT); *Lovett v. Saul*, No. 4:19-CV-2126, 2020 WL 1984014, at *5 (E.D. Mo. Apr. 27, 2020) (finding substantial evidence to support ALJ's reliance on VE's testimony at step five when VE was experienced, counsel did not object to VE's qualifications, VE cogently answered questions from ALJ and counsel, VE testified about sources on which she relied, counsel has opportunity to cross-examine VE about underlying sources and methodology, counsel did not submit post-hearing

---

[7] The VE's resume indicates that he has been a Certified Disability Management Specialist since 2016 and has worked as a vocational rehabilitation counselor/consultant since 2014. (Tr. 313.)

evidence undermining VE's testimony, and nothing in record conflicted with VE's testimony regarding jobs available to someone with plaintiff's RFC) (citing cases); *Postel v. Saul*, No. 18-CV-2017, 2019 WL 4720990, at *26 (N.D. Iowa Sept. 26, 2019) (claimant waived challenge to job VE said claimant could perform when she failed to object to job at administrative hearing).

Therefore, there was substantial evidence to support the ALJ's reliance on the VE's testimony that there are jobs that exist in significant numbers in the national economy that Cerveny could perform, and I reject Cerveny's argument otherwise.

## C.  Weight Given to Opinions of Treating Rheumatologist

In her decision denying Cerveny benefits, the ALJ described the medical-source statement of Cerveny's treating rheumatologist, Dr. Kenik, and assigned little weight to his opinions regarding Cerveny's functional limitations:

> The claimant's rheumatologist, Dr. Kenik, opined that the claimant is able to walk 5 to 10 blocks, sit for 1 hour, and stand for 30 minutes before she needs a break (36F). Dr. Kenik further opined that the claimant could stand and/or walk for a total of 2 hours and sit for about 4 hours during an 8-hour workday (36F). The claimant would need to change positions at will and walk around every 90 minutes (36F). Finally, Dr. Kenik opined that the claimant would miss more than four days per month (36F). Dr. Kenik stated that these limitations were reasonably consistent with the claimant's fibromyalgia diagnosis but did not provide any specific clinical evidence in support of these restrictions.[8]

---

[8] Dr. Kenik's medical-source statement does not mention specific clinical evidence in support of his restrictive functional limitations—rather, it lists Cerveny's subjective complaints; certifies that Cerveny meets the criteria for classification of fibromyalgia based on physical examination and the patient's history; states "TSH normal, ESR-14" and "she has been hyperthyroid, she is currently euthyroid" as to other disorders that may cause fibromyalgia symptoms but have been excluded; contains check boxes as to Cerveny's symptoms that are consistent with fibromyalgia; identifies dry mouth and fatigue as medication side effects that may

> The undersigned gives little weight to Dr. Kenik's opinion because the claimant's examinations have not been consistent with an ability to sit, stand, and/or walk for less than 8 hours during a work day. When Dr. Kenik first examined the claimant in November 2017, she had a normal range of motion and reflexes, was not in distress, and had no noted limitations in her motor strength, gait, or other findings that would be more consistent with the limitations proposed by Dr. Kenik (31F). The claimant continued to report diffuse soft tissue tenderness consistent with fibromyalgia, but her subsequent examinations did not yield results supporting a less than sedentary residual functional capacity (31F). Dr. Kenik's opinion is not supported by his own treatment notes or the other objective medical evidence before the undersigned.

(Tr. 19.)

Cerveny claims that the ALJ did not provide a good reason for giving little weight to the opinions of Dr. Kenik. "[A]n ALJ must give a treating physician's opinion controlling weight if it is well-supported by medical evidence and not inconsistent with the substantial evidence in the record." *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2)).

> If the ALJ decides that the opinion does not deserve controlling weight, the ALJ must provide "good reasons" for this decision and must consider: the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, record support for the opinion, the opinion's consistency, the extent to which the opinion is connected with the physician's specialization, and other relevant factors.

*Id.* (citing 20 C.F.R. § 404.1527(c)(2)-(6)). In providing "good reasons," the ALJ must be "'sufficiently specific to make [it] clear to any subsequent reviewers.'" *Id.* at 1069 (citing SSR 96-2p at *5).

---

affect working; and certifies that Dr. Kenik's answers on the questionnaire are based on review of Cerveny's medical records and examinations. (Tr. 914-918.)

Referring the court only to Dr. Kenik's medical-source statement (Tr. 914-18), Cerveny contends that Dr. Kenik gave opinions concerning her fibromyalgia-related limitations that precluded the performance of light exertional work and work generally, and that the doctor's limitations, if given controlling weight, would have directed a finding of disability. (Filing 12 at CM/ECF pp. 28-29.) Cerveny fails to discuss or give any specific examples of how Dr. Kenik's opinions are well-supported by medical evidence and consistent with substantial evidence in the record.

In contrast, the Commissioner accurately directs the court to specific medical findings that conflict with Dr. Kenik's opinions—findings that Cerveny does not discuss or dispute in her reply brief:

> Dr. Kenik opined that Plaintiff would miss more than 4 days a month and could walk 5 to 10 blocks, sit for 1 hour, and stand for 30 minutes at a time; and stand and/or walk for a total of 2 hours and sit for 4 hours during an 8-hour workday (Filing 6-2, Tr. 19; Filing 7-11, Tr. 917). Contrary to Dr. Kenik's opinion, on November 20, 2017, when Plaintiff initially visited for a fibromyalgia evaluation, . . . Plaintiff had a normal range of motion and reflexes, was not in distress, and had no limitations in her motor strength, gait, or other findings that would be consistent with the limitations proposed by Dr. Kenik (Filing 6-2, Tr. 19; Filing 7-10, Tr. 867). Dr. Kendik [sic] subsequent examination findings revealed similar normal findings except for diffuse soft tissue tenderness (Filing 7-10, Tr. 870, 872).[9]
>
> . . . .
>
> Moreover, as the ALJ noted, Dr. Kenik's opinion was not supported by the record in its entirety (Filing 7-11, Tr. 917). For instance, on November 14 and 20, 2018, when Plaintiff visited Dr. Ascanio, she had a normal range of motion and made no mention of fibromyalgia, which, in any case, was not Dr. Ascanio's area of

---

[9] Subsequent physical examinations also indicated fatigue, arthralgias, myalgias, neck pain, and numbness. (Tr. 868-872.)

14

treatment (Filing 6-2, Tr. 20; Filing 7-8, Tr. 764, 766). Plaintiff had a normal mood, affect, and behavior (Filing 7-8, Tr. 764, 767). On December 3, 2018, when Plaintiff returned to Dr. Ascanio, her physical examination was normal except for very mild swelling around her ankle from a recent fall (Filing 6-2, Tr. 20; Filing 7-8, Tr. 770). Dr. Ascanio's treatment records were also silent on any abnormal observations or clinical signs of functional limitations (Filing 6-2, Tr. 20), a fact that undermined her opinion.

Similarly, other treatment records were silent on observations or clinical signs of functional limitations that would be expected given these physicians' medical source opinions. On August 20, 2018, when Plaintiff followed up on her hyperthyroidism with Dr. Taylon, her physical examination was normal, with normal muscle strength and a normal gait (Filing 7-9, Tr. 792). She was in no acute distress and had a normal neck examination (Filing 7-9, Tr. 792). Plaintiff's follow up visits with Dr. Taylon in October and December 2018 revealed similar normal findings (Filing 7-9, Tr. 797, 802).

(Filing 16 at CM/ECF pp. 15-16.)

Recalling that this court must "defer heavily to the findings and conclusions of the Social Security Administration," *Wright*, 789 F.3d at 852 (internal quotation marks and citation omitted), and may not reverse merely because substantial evidence also supports a contrary outcome, I conclude that the ALJ did nor err in giving little weight to Dr. Kenik's opinions because (1) his treatment notes, which describe Cerveny's symptoms and the doctor's physical findings, are not consistent with the rather severe functional limitations contained in his medical-source statement, *Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (physician's opinion inconsistent with own relatively mild examination findings); (2) his restrictive functional limitations as to Cerveny's ability to work are inconsistent with the normal physical-examination findings of other treating physicians; and (3) Dr. Kenik's medical-source statement does not mention specific clinical evidence in support of Cerveny's restrictive functional limitations. *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (ALJ properly assigned little weight to treating physician's

conclusory functional assessment that consisted of checkbox form citing no medical evidence and providing little to no elaboration); *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (ALJ was entitled to give treating physician's medical-source statement little weight when check-off form did not cite clinical test results, observations, or other objective findings and treatment notes did not report any significant limitations or inability to work due to back pain); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (ALJ properly discounted physician's medical source statement when statement contained severe limitations that "stood alone," did not exist in physician's treating notes, and were not corroborated through objective medical testing).

### D.  Psychologists' Opinions Not Incorporated Into RFC

The ALJ's RFC provides in part, "The claimant is capable of performing simple, routine work." (Tr. 16.) Cerveny assigns as error the ALJ's failure to include in Cerveny's RFC a provision limiting her to "Reasoning Level 1 jobs" under the DOT and precluding her from performing "detailed tasks" when the ALJ gave "considerable weight" to three psychological consultants who opined that Cerveny was precluded from performing detailed work. (Filing 12 at CM/ECF pp. 31-32; Tr. 20-21.) Cerveny argues that such limitations should have been explicitly included in the RFC based on

> Dr. Branham's nonexamining psychological consultant opinions that, inter alia, "added moderate limitations to the claimant's ability to understand, remember, or carry out detailed instructions", Dr. Fairbank's opinion that Ms. Cerveny was capable of carrying out short and simple instructions, and Dr. Delat's[10] examining psychologist opinions explaining she would perform better in jobs that did not require detailed or complex procedures . . . .

---

[10] It appears the ALJ misspelled the doctor's name. An Adult Psychological Assessment Report dated February 7, 2017, indicates the proper spelling is Dr. DeLaet. (Tr. 418-427.)

(Filing 12 at CM/ECF p. 31.)[11]

Cerveny asserts that by referencing the above opinions, the ALJ "*was explaining, essentially*, that Ms. Cerveny was limited to Reasoning Level 1 jobs per the Dictionary of Occupational Titles" and that "[t]he ALJ *meant to* preclude detailed tasks in the RFC." (Filing 12 at CM/ECF pp. 31-32 (emphasis added).) This matters, argues Cerveny, because only one job listed by the ALJ at step five—housekeeping cleaner—requires Reasoning Level 1[12] and does not require the performance of detailed tasks under the DOT, while the remaining jobs were all at Reasoning Level 2[13] or above.[14]

I am not persuaded that the ALJ's RFC limitation of "simple, routine work"

---

[11] *See* Tr. 105-06 (Dr. Branham opining that Cerveny is "moderately limited" in the "ability to understand and remember detailed instructions" and the "ability to carry out detailed instructions"); Tr. 513 (Dr. Fairbanks stating that Cerveny is able "to understand and remember short and simple instructions" and to "carry out short and simple instructions under ordinary supervision"); Tr. 426 (Dr. DeLaet concluding that Cerveny "is likely to do well in jobs that are not particularly detail oriented . . . . She would also do better in jobs where performance does not require detailed or complex procedures.").

[12] Reasoning Level 1 is defined as applying "commonsense understanding to carry out simple one- or two-step instructions." DICOT 323.687-014 (G.P.O.), *available at* 1991 WL 672783 (2020) (Housekeeping Cleaner).

[13] Reasoning Level 2 is defined as applying "commonsense understanding to carry out detailed but uninvolved written or oral instructions." DICOT 239.567-010 (G.P.O.), *available at* 1991 WL 672232 (Office Helper); DICOT 222.687-022 (G.P.O.), *available at* 1991 WL 672133 (Routing Clerk).

[14] DICOT 241.367-038 (G.P.O.), *available at* 1991 WL 672258 (Dealer Accounts Investigator, Reasoning Level 4). As stated previously, the Commissioner concedes that this job should not have been included in those Cerveny could perform.

17

was incomplete or that the ALJ was required to expressly preclude detailed tasks in her RFC finding just because the ALJ gave "considerable weight" to three of the psychologists' opinions, two of whom thought it would be best for Cerveny to avoid jobs requiring "detailed" instructions and procedures. (Tr. 105-06 (Dr. Branham opining that Cerveny is "moderately limited" in the "ability to understand and remember detailed instructions" and the "ability to carry out detailed instructions"); Tr. 426 (Dr. DeLaet concluding that Cerveny "is likely to do well in jobs that are not particularly detail oriented . . . . She would also do better in jobs where performance does not require detailed or complex procedures.").)

First, there is no reason to assume—as Cerveny's counsel would have me do—that the ALJ intended to limit Cerveny to jobs classified as Reasoning Level 1 or that precluded detailed tasks. In posing her hypothetical to the VE, the ALJ specified "two, three, four[-]step tasks, simple, routine type work" and did not mandate—or even discuss—that Cerveny was limited to Reasoning-Level-1 jobs. (Tr. 63.) Indeed, the Eighth Circuit Court of Appeals has found no conflict between a hypothetical that required "simple, routine and repetitive work activity" and the VE's identification of jobs involving instructions that were potentially detailed, but not complicated or intricate. *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010) (rejecting claimant's argument that hypothetical limiting him to "carrying out simple job instructions" and "simple, routine and repetitive work activity" required VE to identify jobs using only "Level 1" reasoning when ALJ did not limit "simple" job instructions to "simple one- or two-step instructions" or otherwise indicate that claimant could perform only occupations at a DOT Level 1 reasoning level; "There is no direct conflict between 'carrying out simple job instructions' for 'simple, routine and repetitive work activity,' as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate."); *see also Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 367 (8th Cir. 2007) (expert's opinion that claimant who was limited to following "simple, concrete instructions" could work as cashier was not inconsistent with DOT description of cashier—which requires Level 3 reasoning—when claimant's past work history as cashier showed she could perform such work; noting

18

that DOT definitions are simply generic job descriptions that offer approximate maximum requirements for each position, not their range).

Second, the ALJ was not required to adopt the "detailed" language from Dr. Branham's and Dr. DeLaet's opinions just because they were psychologists to which the ALJ generally assigned considerable weight. *See, e.g.*, *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations."); *Taylor v. Colvin*, No. 4:15CV00723, 2016 WL 4581418, at *2 (E.D. Ark. Aug. 31, 2016) ("the RFC need not mirror the findings of any one physician"); *Zeier v. Colvin*, No. 4:15CV156, 2016 WL 1068995, at *9 (E.D. Mo. Feb. 26, 2016), *report and recommendation adopted*, No. 4:15CV156, 2016 WL 1060371 (E.D. Mo. Mar. 17, 2016) ("It is entirely proper for the ALJ to consider the opinion of a non-examining state agency physician along with the record as a whole. Here, the ALJ did not simply adopt the June 2012 conclusions of Dr. Dees while ignoring the rest of the record and the later-developed medical evidence. Rather, she considered Dr. Dees' opinion in the context of the entire record, adopting his conclusions *to some extent* but also adding additional limitations not found in Dr. Dees' opinion." (emphasis added)); *Anderson v. Astrue*, No. CIV 09-2091, 2010 WL 2735721, at *25 (D. Minn. June 15, 2010), *report and recommendation adopted*, No. CIV 09-2091, 2010 WL 2732902 (D. Minn. July 9, 2010) ("An ALJ need not accept every limitation posed by a physician as true.").

I decline to divine what the ALJ "was explaining, essentially" and what "[t]he ALJ meant to preclude" from the clear language of Cerveny's RFC, as counsel would have me do. (Filing 12 at CM/ECF pp. 31-32.) Nor do I agree that the ALJ was required to adopt each and every part of Dr. Branham's and Dr. DeLaet's opinions just because the ALJ generally assigned their opinions considerable weight.

## E.  Constitutionality of ALJ's Appointment

Cerveny argues that the ALJ's denial of benefits should be vacated because

the ALJ was not properly appointed by the President or a "Head of Department" within the meaning of the Appointments Clause of the United States Constitution, U.S. Const. art. II, § 2, cl. 2. Cerveny also contends that this court may address her constitutional challenge despite the fact that Cerveny did not raise this argument at any time during her administrative proceedings before the Social Security Administration. (Filing 12 at CM/ECF p. 33.)

On June 26 and July 9, 2020, the Eighth Circuit Court of Appeals decided that when a Social Security plaintiff fails to raise an Appointments Clause claim during proceedings before the Social Security Administration, the plaintiff waives the argument by failing to raise it before the agency, and the district court may properly decline to consider the issue. *Hilliard v. Saul*, No. 19-1169, ___ F.3d ___, 2020 WL 3864288, at *2 (8th Cir. July 9, 2020) (Eighth Circuit Court of Appeals would not consider Appointments Clause challenge when claimant did not raise the issue before the ALJ); *Davis, Thurman & Iwan v. Saul*, 963 F.3d 790 (8th Cir. 2020) (exception to longstanding principle of administrative law that an issue not presented to administrative decisionmaker cannot be argued for first time in federal court was not warranted in Appointments Clause challenge to ALJ's appointment).

Because Cerveny failed to raise her constitutional challenge to the ALJ's appointment before the Social Security Administration, she has waived the argument in this court, and it shall not be further considered.

## V. CONCLUSION

For the reasons discussed above, the Commissioner's decision is reversed due to the ALJ's failure to address and elicit a reasonable explanation for the possible conflict between Cerveny's RFC limitation of occasional overhead reaching and the DOT requirement of frequent reaching for the housekeeping cleaner, office helper, and routing clerk jobs. None of the other reasons asserted by Cerveny are a basis for reversal. Accordingly,

IT IS ORDERED:

1.     Plaintiff's Motion for Order Reversing Commissioner's Decision (Filing 11) is granted.

2.     Defendant's Motion to Affirm Commissioner's Decision (Filing 15) is denied.

3.     The Commissioner's decision is reversed pursuant to sentence four of 42 U.S.C. § 405(g), and this case is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.

4.     Judgment will be entered by separate document.

Dated this 24th day of July, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge